**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | |
|---|---|
| J.H.,<br><br>Plaintiff,<br><br>v.<br><br>RED ROOF INNS, INC.; RRI III, LLC; *and* RRI WEST MANAGEMENT, LLC,<br><br>Defendants. | CIVIL ACTION FILE<br>NO. ____________________<br><br>**JURY TRIAL DEMANDED** |

**COMPLAINT**

1.

J.H. is a victim of sex trafficking at the Red Roof Inn[1] located at 1960 North Druid Hills Road NE, Atlanta, Georgia 30329 (the "Hotel or "Red Roof") when it was owned, operated, managed, or controlled by Defendants. From approximately 2013 through May 2015, J.H. was sold for sex at the Red Roof, beginning when she was a child of only 14 years old. Given the nature of the case, Plaintiff is identified in this Complaint by her initials. Plaintiff's counsel will disclose her full name to

[1] At all times relevant to this Complaint, the Hotel was branded as a "Red Roof Inn" or "Red Roof Plus+"; but these brands are just a trade name for Defendants' business of running the Hotel and not an entity with any independent existence separate from Defendants. Just the opposite. Both brands were owned or controlled by Defendants at all relevant times. For simplicity, the Hotel is referred to as the Red Roof but that incorporates the Hotel's operation under both brands and the physical hotel.

defense counsel as soon as they are known or as soon as an appropriate protective order is in place.[2]

2.

For more than a decade, the Red Roof has been a known center of commercial sex. Buyers of commercial sex, sex traffickers, and law enforcement all knew its reputation for sex trafficking and prostitution.

3.

Employees at every level, from the Red Roof's cleaning staff to the CEO of Defendant Red Roof Inns, Inc., knew about the rampant sex trafficking and prostitution there. Defendants kept renting rooms to traffickers and kept profiting from those rentals.

4.

Defendant Red Roof Inns, Inc. ("RRI"), is a Delaware corporation with its principal place of business at 7815 Walton Parkway, New Albany, Ohio 43054. RRI regularly conducts business in Georgia, derives substantial revenue from services rendered in Georgia, and has committed tortious acts or omissions both within and outside Georgia that resulted in injuries in Georgia. RRI may be served with process

[2] In conjunction with this Complaint, Plaintiff will file a Motion for Protective Order and Leave to Proceed Anonymously because the allegations in the Complaint, which include child sex trafficking, are intimate and personal in nature and raise concerns for Plaintiff's own personal safety.

by serving its registered agent, Corporation Service Company, 2 Sun Court, Suite 400, Peachtree Corners, GA 30092 or as otherwise authorized by law.

5.

Defendant RRI West Management, LLC ("RRI West") is a Delaware limited liability company with its principal place of business in Houston, Texas. RRI West regularly conducts business in Georgia, derives substantial revenue from services rendered in Georgia, and has committed tortious acts or omissions both within and outside Georgia that resulted in injuries in Georgia. RRI West may be served with process by serving its registered agent, Capitol Services, Inc., 108 Lakeland Avenue, Dover, Delaware 19901, or as otherwise authorized by law.

6.

Defendant RRI III, LLC ("RRI III") is a Delaware limited liability company with its principal place of business in Houston, Texas. RRI III regularly conducts business in Georgia, derives substantial revenue from services rendered in Georgia, and has committed tortious acts or omissions both within and outside Georgia that resulted in injuries in Georgia. RRI III may be served with process by serving its registered agent, CT Corporation System, 289 S. Culver Street, Lawrenceville, Georgia 30046, or as otherwise authorized by law.

7.

RRI, RRI West, and RRI III are referred to collectively as "Defendants." But each allegation herein shall be construed as if it refers to each Defendant, individually, or all Defendants acting together in a common venture or otherwise in concert as *de facto* or *de jure* agents and principals of each other.

8.

Jurisdiction and venue are proper as to each and all Defendants.

9.

At all times relevant to this case, Defendants owned, operated, controlled, or managed the Red Roof.

10.

The Red Roof was a corporate location: a Red Roof-branded hotel owned and operated by entities ultimately owned or controlled by RRI rather than by an independent franchisee. From at least 2009 through at least 2017, RRI, by and through its employees, alter egos, co-joint venturers, subordinates, or other agents, controlled, operated, and managed the Red Roof. At all times relevant to this complaint, Defendant RRI ultimately exercised control over the day-to-day operations at the Red Roof, whether by directly operating and managing the Red Roof or indirectly by exercising such a degree of control over the Red Roof and subordinate entities

and personnel employed by or at the Red Roof that, functionally, said Defendants had control and responsibility for what happened at the Red Roof.

11.

RRI employed some or all of the employees who worked at the Red Roof. RRI III and RRI West had no employees and conducted no business at or relating to the operation of the Red Roof independent of RRI.

12.

Defendants each received a financial benefit, whether revenue or royalty, from each room rental at the Red Roof.

13.

For purposes of owning, operating, managing, and control of the Red Roof, RRI, RRI III, and RRI West, functioned as a single entity, with RRI ultimately controlling the others. RRI and the other Defendants are directly liable for their own conduct regarding the ownership, operation, management, and control of the Red Roof. RRI and the other Defendants are also liable for the actions and knowledge of the other Defendants, which are their alter egos, agents, co-joint venturers, or otherwise functionally the same entities.

14.

Defendants knew that sex trafficking and prostitution were rampant at the Red Roof for years—before, during, and after Plaintiff's trafficking. Defendants knew because:

a. Defendants knew about Plaintiff while she was sold for sex at the Red Roof;

b. Defendants' employees, including RRI corporate employees who monitored the Red Roof, knew of, permitted, or observed signs of sex trafficking and prostitution at the Red Roof;

c. Defendants knew about several other sex trafficking victims at the Red Roof before, during, and after Plaintiff was sold for sex there;

d. Defendants knew about criminal activity occurring at the Red Roof that is commonly associated with sex trafficking;

e. Defendants knew about reports of Hotel guests regarding sex trafficking and prostitution-related activities; and

f. Defendants had knowledge of sex trafficking in the Atlanta area generally and at the Red Roof specifically.

15.

A person under the age of 18 cannot consent to having sex in exchange for money. Any commercial sex involving a person under eighteen (i.e., "minor sex

trafficking") is criminal sex trafficking under federal and Georgia law, regardless of whether the child had a trafficker/pimp or was subjected to "force, fraud, or coercion." 18 U.S.C. § 1591(a); O.C.G.A. § 16-5-46(8)(B). Every person who engages in commercial sex with a child is sex trafficking that child under § 1591(a)(1).

16.

Sex trafficking and prostitution were common occurrences at the Red Roof. Defendants chose to ignore, allow, condone, facilitate, support, or permit such activity at the Red Roof. Defendants are liable to Plaintiff for their actions and failures to act. Defendants' liability to Plaintiff is straightforward:

a. The Trafficking Victims Protection Reauthorization Act ("TVPRA") provides a cause of action to victims of sex trafficking against "whoever knowingly benefits . . . financially or by receiving anything of value from participation in a venture which that person ***knew or should have known*** has engaged in an act in violation of" the TVPRA. 18 U.S.C. § 1595(a) (emphasis added). Defendants knowingly benefited from participation in a venture that they knew or should have known engaged in an act in violation of the TVPRA. While operating the Red Roof, a common undertaking involving risk and potential profit, Defendants, individually or in concert, (i) rented a room, and provided other products or services in exchange

for money or things of value, to Plaintiff's trafficker so Plaintiff could be violently sold for sex at the Red Roof on multiple occasions, and (ii) did so despite what they knew or should have known about Plaintiff being a victim of sex trafficking during the course of the room rental or other transactions. As a result of Defendants' acts and failures to act, Plaintiff suffered physical and mental harms, and Defendants are liable to Plaintiff for the damages arising from those harms under the TVPRA.

b. Defendants, through the Red Roof's staff, facilitated, condoned, or participated in Plaintiff's false imprisonment by her traffickers. Among other things, the Red Roof staff created an unsafe environment where dangerous criminal activity was permitted and created a real and substantial barrier to Plaintiff's freedom of movement while at the Red Roof.

c. The Red Roof constituted a public nuisance under Georgia law because the Red Roof negligently or recklessly turned a blind eye and permitted illegal activities to occur at the Red Roof, including rampant prostitution, sex trafficking, crimes against women, drugs, violence, and other dangerous, illegal activity. As a direct result of this nuisance, Plaintiff was sold for sex at the Red Roof, causing her substantial harm.

d. Because Plaintiff was a child when she was trafficked at the Red Roof, and because Defendants knowingly benefitted from or otherwise facilitated her trafficking, Masha's Law, 18 U.S.C. § 2255, provides a civil remedy to Plaintiff for the substantive violation of 18 U.S.C. § 1591.

17.

Whenever reference is made in this Complaint to any act, omission, deed, or conduct of one or more Defendants or the subject company/property, the allegation is that the Defendant or subject company/property engaged in the act, deed, or conduct by or through one or more of its officers, directors, agents, employees, or representatives who were actively engaged in the management, direction, control, or transaction of the ordinary business and affairs of the Red Roof and at all relevant times acted within the course and scope of such persons' relationship with Defendants.

18.

Whenever reference is made in this Complaint to any act, omission, deed, or conduct of one or more Defendants the allegation is that Defendants acted together and collectively, as agents/principals of each other, in a joint venture, as alter egos of the other, or otherwise in concert in such acts, omissions, deeds, or conduct.

## I. J.H.'s trafficking at the Red Roof.

19.

In or around the summer of 2013, beginning when she was only 14 years old, J.H. was sold for sex at the Red Roof multiple times. Defendants' Hotel was a regular hotel in the rotation of places where she was sold for sex in the Atlanta area. J.H.'s trafficker went to the Red Roof because the hotel staff knew him. The Red Roof was an easy place to get away with criminal activity, including sex trafficking a child like J.H. At all times while she was being trafficked, J.H.'s young age was apparent to anyone who encountered or observed her.

20.

J.H. was taken to the Red Roof by her pimp (trafficker) and kept in a room at the Red Roof for a couple days to a week at a time where she was repeatedly sold for sex. Her trafficker also sold another child for sex at the same time and out of the same room at the hotel. When J.H.'s trafficker would move the operation, he would return to the Red Roof with J.H. and the other victim at least once a month or so and continue selling J.H. and the other victim for sex in a Hotel room. During each stint at the Red Roof, J.H. was sold for sex to multiple buyers.

21.

Hotel staff regularly encountered J.H.'s sex trafficking. They routinely came to the room where J.H. was harbored to provide extra towels, linens, and other

housekeeping items. As is common when girls are sold for sex, they require an inordinate amount of towels and related supplies to clean themselves between the repeated, often back-to-back, sexual encounters. The front desk also frequently provided additional supplies to J.H. and other girls being sold there for sex. Hotel front desk staff were familiar J.H. and her need for additional housekeeping supplies. Those staff would often even ask J.H. if she (or the other minor child trafficked with J.H.) if they needed extra towels. These housekeeping needs significantly exceeded the needs of ordinary hotel guests. J.H. and the other minor victim also bought extra condoms from the Red Roof. When they were running low on condoms because they used them all during the back-to-back sexual encounters, she and other girls being sold at the Red Roof for sex would buy multiple packs of condoms from the Red Roof, as many as 10 at a time. They usually bought enough condoms for all of the men who paid to have sex with them at the Red Roof. By providing these extra supplies, the Red Roof facilitated the illicit trafficking, as well as the traffickers who sold, and buyers who bought, J.H. for sex.

22.

J.H. and the other child victim were usually with their older male trafficker when they checked into the Red Roof. Hotel staff were familiar with him, calling him by the nickname they knew him by (“TJ”). Even though her traffickers kept her at the Red Roof for multiple days, they typically paid daily for the rooms. J.H.’s

trafficker would send her or the other minor to the front desk to pay for the room in cash. The Red Roof did not require an ID to extend the room rentals.

23.

Each time Hotel staff came to the room where J.H. was being harbored and sold for sex, they would or should have observed signs that J.H. and another minor were being sold there for sex. Inside the room there were numerous used condoms visible in the trash cans; the smell of sex, drugs, or alcohol; opened condom wrappers in the trash or strewn around the room and on the floor; unused condoms, including condoms purchased at the hotel, out in the open and in quantities that were way more than anyone needed for personal use; and big bottles of lubricant used for sex. They would also have encountered J.H. and other girls being sold for sex in the room and around the Red Roof with inappropriate clothing for their obvious youth, things like fishnet, sheer fabric, booty shorts, a bra with no shirt, and similar outfits that revealed or barely covered their naked bodies.

24.

Staff were familiar with J.H.'s trafficker and knew he rented the room where J.H. was being sold for sex. This was obvious because they called or referred to him by a nickname. The staff interacted with and spoke to J.H.'s trafficker regularly, including at or in the room and around the Red Roof property, when they checked

into the hotel, between commercial sex transactions, and when providing additional housekeeping supplies.

25.

J.H.'s trafficker was violent and abusive toward J.H. and the other minor victim he sold for child sex at the Red Roof. Other traffickers were also violent with their victims, including young girls, out in the open. On one occasion, one of the pimps was in a fight in the Red Roof parking lot with one of his girls. It drew a lot of attention from guests and employees who stood around and watched. The pimp badly beat the girl and dragged her into a room at the Red Roof. But the Red Roof didn't do anything about it and at least one employee watched and just went back inside. These abusive encounters were common and would often leave visible bruising or other visible marks or other signs of the abuse to victims, like J.H., that could be seen by anyone who encountered them, including Hotel staff.

26.

Hotel staff knew, or should have known, that J.H.'s trafficker forced J.H. into selling sex at the Red Roof. Hotel staff never asked questions about J.H.'s or other victims' well-being, reported injuries or likely assaults, or otherwise tried to help J.H. or intervene in the obviously illegal and dangerous activity in the room where J.H. was being sold for sex.

27.

Front desk staff knew or should have known that J.H. was a minor who was being sold for sex. Visibly, and in her demeanor and bearing, J.H. looked like a young teenage girl. Her perceptible youth appeared in particularly stark contrast to her trafficker, who was much older, and the lack of any indication of natural affection or relationship between them during the numerous times that Hotel staff observed them together. In fact, J.H.'s and the other victim's cowed demeanor toward their trafficker only further showed that they were children and under the watchful control of their trafficker.

28.

J.H. and the minor victim were always hanging around the hotel where staff could and did see or interact with them. They would hang out on the balconies, sometimes in just a towel, and could be seen from the parking lot. While one of J.H. or the other victim was in a room with a date that paid to have sex with the child, the other was often hanging around the hotel or walking nearby. J.H. and the other girls also frequently walked to and from the hotel, including when they walked along the road and to nearby businesses where they picked up dates. When they caught a date, they would walk back to the hotel room with the john. It was obvious those johns were paying to have sex with the young children.

29.

The Red Roof was extremely busy with commercial sex. J.H. was forced to have sex with as many as 15 and up to 20 or 25 dates a day or more per day at the Red Roof over the course of a year or more. Her trafficker enforced, with threats and violence, a quota of several thousand dollars per week that she had to make from selling sex. There were so many dates and so many people selling sex that it was normal to just “switch” buyers with another girl at the hotel. That meant that when one john left a room with one girl he walked to another room with another girl, including children like J.H., and paid for sex with them in a back-to-back sexual encounter.

30.

It was normal to see other women and girls, including other children who were in fact and appearance as young as J.H., who were also being sold for sex at the Red Roof. J.H. was aware of at least 10 or more girls selling sex at the Red Roof during the same periods during which she was sold for sex at the Red Roof.

31.

The Red Roof usually placed J.H. and her trafficker on the same area of the hotel on an upper floor with a balcony. J.H. could see the constant traffic of buyers of sex coming and going from the hotel and when she was walking in the parking lot picking up dates. They would pull up to the Red Roof parking lot, often backing in

so the license plates weren't facing out. The driver would get out, or call to a girl like J.H. walking around the parking lot, and then pay to have sex with them in a room at the Red Roof for a short period of time. Then, they would leave (or pay for another) shortly after.

32.

The Red Roof had a lot of pimps. At any given time, J.H. was aware of at least five or more pimps keeping careful watch and collecting money from the girls they were selling for sex at the Red Roof. The pimps often had girls they were selling for sex with them and in the rooms they rented. Many were around the same age as J.H.––just children of 14 to 16 years old. These pimps and their victims were always hanging around outside their rooms, sitting by their cars in the parking lot, or exchanging cash for sex or doing drug deals.

33.

On a given day a hundred or more buyers of sex would come and go from the Red Roof to pay for sex with the child J.H. and the other girls being sold for sex at the Red Roof. The buyers would arrive and leave after short periods of time (15–30 minutes, sometimes more and sometimes less). They would enter a room where J.H. or another girl who was being harbored and leave shortly after. The buyers' frequent coming and going was obvious. Cars were constantly pulling into the lot looking for girls, drugs, or both.

34.

The traffickers at the Red Roof supplied J.H. and the other girls, including children, with drugs and alcohol. The intoxicating influence of these substances was obvious to anyone who saw the girls. J.H. once became so intoxicated that she fell and injured her knee in the Red Roof parking lot. Her pimp came down to where she fell, bleeding, and was mad because she was drinking, not working. Uncaring, he jerked her up and took her, bleeding, back to the room. Other people and Hotel staff were around but no one did anything to help her, even though J.H. was so obviously hurt, intoxicated, and bleeding to the point that she couldn't sell sex anymore that night.

35.

Among other things, given J.H.'s clothing, demeanor, young age, recurring need for condoms and excessive housekeeping supplies, movement around the Red Roof picking up dates, paying cash for rooms, companionship with men who were clearly pimps or johns, hotel staff knew, or should have known, that she was being sold for sex in a room at the Red Roof. The Red Roof furthered J.H.'s trafficking by providing those rooms where she could be harbored and sold, providing condoms and other supplies to the child, and implementing policies and practices that made it easier to make money from sex trafficking and other crime, when they knew, or should have known, that J.H. was being sold for sex as a child at the Red Roof.

36.

The Red Roof had a policy or practice of managing problems on its own and avoiding law enforcement interference at the Red Roof when things happened on the property, especially commercial sex. The Red Roof implemented this policy or practice as to J.H. and her traffickers by undertaking efforts to prevent police presence and to minimize the signs of commercial sex activity.

37.

The Red Roof established an ongoing and recurring business relationships with J.H.'s trafficker and his associates over the course of a year and more. J.H.'s traffickers were familiar with and familiar to the Red Roof from, among other things, previous room rentals where the traffickers conducted similarly illicit activities at the Red Roof. The Red Roof also allowed J.H.'s trafficker to stay in the room past checkout time without paying if they needed more time to make the cash they needed to pay for the room. In this way, the Red Roof extended "credit" to J.H.'s traffickers and made special exceptions. The Red Roof knew, or had ample reason to know, that the money would be made by selling J.H. and other girls for sex out of the rooms. Because it was profitable to maintain this ongoing business relationship, Hotel staff invested in and furthered their business relationship with J.H.'s trafficker by renting rooms and providing other services that furthered the illicit and dangerous activity

at the Red Roof, including J.H.'s and other children sex trafficking, over the entire period in which J.H. was sold for sex at the Red Roof.

38.

Defendants increased their profit from J.H. and others' sex trafficking at the Red Roof despite knowing or having reason to know that increased profit was coming from J.H.'s and others' sex trafficking. The Red Roof was aware of the activity at the Red Roof, and whenever the activity at the Red Roof increased, which the Red Roof knew, or should have known, was a result of J.H. and other victims', including children's, sex trafficking, the Red Roof made more money from the commercial sex activity.

## II. Defendants' knowledge of crime at the Red Roof.

39.

The Red Roof had a well-established reputation for criminal activity, including prostitution and sex trafficking.

40.

Defendants, individually or in concert, owned and operated the Red Roof and employed the employees who worked there, giving them specific and direct knowledge of prior and ongoing crime, including prostitution and sex trafficking occurring at the Red Roof during and before the entire period of Defendants'

ownership, management, operation, or control of the Red Roof, including at all times when J.H. was sold there for sex.

41.

RRI's corporate employees also knew for years that children were being sold for sex at the Red Roof. They visited the Red Roof premises and monitored the Red Roof's revenue, occupancy, online reviews, and physical premises. These corporate employees included Jay Moyer, who monitored corporate locations, including the Red Roof. Front desk and other onsite employees would pass on complaints about issues at the hotel to such employees, including disturbances involving girls and women being sold for sex at the Red Roof. These employees' knowledge was Defendants' knowledge.

42.

One of Defendants' employees who worked the front desk at the Red Roof around 2012 testified that it "doesn't take a rocket scientist" to know "when someone is prostituting" at a hotel, like the Red Roof. He testified that there is no question that children were being sold for sex at the Red Roof and that Defendants' corporate employees and upper management/executives, including Moyer, knew that children were being sold there for sex. Employees could see and interact with these young girls being sold for sex at the Red Roof when they paid for room extensions, hanging around the balconies, and walked around the premises. There were occasions when

the employee saw women being dragged into a room and he reported it to the general manager. But the employee was not instructed to call the police for this or any other illicit activity at the hotel. And he was also never trained or instructed about identifying and reporting criminal activity, like sex trafficking, at the Red Roof.

43.

Another employee who worked security testified that what was going on at the Red Roof was "obvious," but the hotel didn't care. She referred to the Red Roof as "hotel hell." The girls being sold for sex at the Red Roof were clearly under their pimp's control, like they were "brainwashed" so bad they could not even say what they wanted. She described how the girls acts, maturity level, and demeanor, especially toward their traffickers, made it obvious that they were just children.

44.

The Red Roof developed policies to move guests, like sex traffickers, whose activity caused disturbances or complaints to the backside of the Red Roof so the activity could continue. The Red Roof focused on putting "heads in beds" above anything else because that's how it made money.

45.

Before, during, and after Plaintiff's child sex trafficking at the Red Roof, prostitution and sex trafficking were rampant, frequent occurrences at the Red Roof. It

was obvious or otherwise known to Hotel staff, guests, and anyone in the area of or who otherwise encountered the Red Roof that sex trafficking happened there.

46.

The Red Roof's design made trafficking easy to see. Trafficking activity, violence, police activity, and other activity in or around room entrances was visible from the parking lot, lobby, and other common areas. It was easily observed by Hotel employees.

47.

Because the Red Roof employees acted within the course and scope of their employment, their knowledge, support, and assistance are attributable to Defendants.

48.

J.H. is not the first trafficking victim to allege she was sold for sex at the Red Roof. Other victims have sued Defendants over their trafficking at the Red Roof between 2009 and 2017. At least some of these other victims of sex trafficking at the hotel were children under the age of eighteen, which was known or should have been known to Defendants based on the children's looks, voices, demeanor, and bearing, as well as the interactions with the traffickers and associates that accompanied them and who were selling them for sex with little regard for concealing it. These traffickers (pimps) were obviously selling girls for sex—they wore flashy jewelry, drove

nice cars, and were always surrounded by women. On multiple occasions, the young victims' traffickers would come and go to the Red Roof with between 3 and 5 young girls in tow, all of whom were frequently dressed inappropriately for their apparent age and the weather. The child victims were kept under tight control by their traffickers. The traffickers would openly berate and yell at the girls. The traffickers also supplied their young victims with drugs and substances that left them in a state of impairment and vulnerability obvious to anyone to anyone that encountered them, which the Red Roof staff regularly did. Some traffickers rented multiple rooms in which the child victims were harbored and sold for sex, which was also or should also have been known to Defendants. Though they typically stayed for multiple days, the traffickers paid daily in cash for the rooms. When the traffickers and victims would leave the Red Roof, the employees would inquire whether to hold the rooms for them.

49.

As early as 2011, a manager at the Red Roof observed that prostitution was a consistent problem at the Red Roof and reported the problem up the corporate chain to Defendants. But Defendants failed to respond or do anything about it and, instead, just continued collecting money from the room rentals.

50.

Defendants' own policies and contracts required them to track police activity at the Red Roof. RRI's policies required Hotel managers to complete an incident report whenever police were called and to send it up the chain to RRI. A franchise policy required Defendants' employees who worked at the Red Roof to report safety or security events at the Red Roof up the corporate chain, including police activity and arrests. Upon information and belief, those reports were made or should have been made, in which event, they would have included information about criminal and illicit activity, including sex trafficking and other, related crimes at the RRI.

51.

Law enforcement frequently investigated and responded to criminal activity at the Red Roof, including crime that is commonly associated with sex trafficking like prostitution, violent crime, and drugs. Such activity alerted or should have alerted Defendants to the Red Roof's rampant sex trafficking, prostitution, and sex crime problem, among other illicit and dangerous crime that harmed Plaintiff. Among others, below are a few examples of such criminal activity from before, during, and after the time J.H. was sold for sex at the Red Roof.

i. In June 2011, police conducting a business check at the Red Roof "due to the large number of residential burglaries in the area" arrested one man and cited another for **loitering for drugs**.

ii. In September 2011, the DeKalb County Vice Unit conducted an undercover operation at the Red Roof in which officers bought marijuana "in reference to illegal **drug activity and prostitution**."

iii. In November 2011, police made a **drug arrest** in the Red Roof's parking lot during a routine patrol of an area they described as "known to be an area heavy in **drug sales and prostitution**."

iv. In November 2011, during a patrol of the Red Roof area the police described as "**known for prostitution and drug activity**," DeKalb County police arrested a woman for **loitering for sex**. She was the "female listed on [a] website for implied **prostitution**," and she "admitted that she ha[d] been **prostituting out of room #307** for the past day." She had moved from another room earlier in the week after police showed her "the ad, which clearly show[ed] her face and body."

v. In March 2012, police increased patrols around the Red Roof after a "**recent shootin**g" at the location.

vi. In May 2012, the Red Roof's security guard and night clerk called police after a report of a loud disturbance in a room "that sounded like a **possible assault**." In the room, they found **blood on the door**, "**blood spatters** on the floor and on the bed," and broken glass.

vii. In June 2012, DeKalb County police patrolling the area arrested a man in the Red Roof's parking lot after a search of his car turned up small baggies for distribution, 12 **syringe needles**, prescription pills, and **cocaine**. Police also found **methamphetamine** and a syringe in his pocket.

viii. In September 2012, United States Marshals looking for a wanted person at the Red Roof found him in a room with "a scale with **white powder and a hand gun** with the serial number filed off . . . laying in plain sight."

ix. In September 2012, the DeKalb County Police Department's Vice Unit conducted an undercover operation at the Red Roof "targeting females that engage in acts of **prostitution** by advertising their services over the Internet." An officer responded to a Backpage.com advertisement offering "the company of two girls." Police entered the room and recovered **crack cocaine, powder cocaine, and MDMA** that appeared packaged for distribution.

x. In April 2013, police responded to the Red Roof after an **armed robbery** of a man and a woman. The woman reported that her **pimp** had dropped her and another woman off at bars "on Buford Hwy to **solicit some men for sex**." When the man refused to pay the agreed price, **her pimp "came into the room and took the rest of the money at gunpoint**."

xi. In May 2013, police cited a man at the Red Roof "for **loitering for sex**" after **encountering him and a female companion in the Red Roof lobby**.

xii. During a May 2013 undercover operation by the DeKalb County Police Department Vice Unit, police arrested two women for **prostitution** at the Red Roof after responding to an advertisement on Backpage.com.

xiii. In May 2013, Dekalb County Police were patrolling the area and observed a suspicious vehicle. One of the men inside of the vehicle lied to the police regarding his identity and the lack of ID cards. Police conducted a search of the vehicle after obtaining verbal consent and located a black tote bag containing an orange straw with an **off-white residue**, a **glass pipe** with burnt edges, and a clear plastic bag containing an off-white rock like substance that was later tested and confirmed as **methamphetamine**.

xiv. In July 2013, police responded to the Red Roof after a **woman was beaten by the man and two women she had been staying with** when she said she wanted to leave. She told police the group was involved in "**solicitation activity**" and "frequent[ed] this motel and [got] different rooms frequently as well."

xv. In August 2013, Brookhaven Police began an investigation after observing a suspicious male walking around the front of the building. **The man walked to the back of the motel, entered room 212, and later emerged**

**with a female**. The officer recognized this woman as he came across her ad **soliciting sex** with pictures while he was gaining intelligence on the suspicious activity in the Brookhaven Area.

xvi. In January 2014, Brookhaven Police responded to room 222 regarding found property. While **housekeeping was cleaning the room, she discovered two handguns inside the nightstand**.

xvii. In March 2014, Brookhaven Police located and arrested a wanted person for **felony theft**.

xviii. In May 2014, a DeKalb County Vice Unit undercover operation at the Red Roof resulted in two arrests for **prostitution** and a third for possession of a **stolen firearm**. Police found the man with the stolen firearm in a first-floor room with **two women**, who told police he had instructed them the day before to hide the firearm in a purse.

xix. In August 2014, Brookhaven Police responded to room 211 after management discovered a **loaded handgun** in the nightstand drawer.

xx. In August 2015, Brookhaven Police responded to a disturbance at the hotel. The manager stated that Kevin Jones was causing a disturbance after reporting issues with the heat and **finding condoms on the floor**. After conducting searches on Jones and his companion, he found that Lashawn Alexander was listed as a missing person. The entry advised that she may

be with Jones and was a **victim of abuse** at his hands and he travels about the motels in Charlotte.

xxi. On April 10, 2016, Brookhaven police patrolling the area in response to an "increase of illegal **narcotics and prostitution activity in the immediate area**" found a man waiting in a car in the Red Roof's parking lot. He had rented a room using a forged Illinois ID. In that room, officers found a 17-year-old girl and a 41-year-old man who told officers he **came to the Red Roof in response to an advertisement on Backpage**.

52.

RRI monitored online reviews of the Red Roof every day. Online review scores and ratings were essential to RRI's evaluation of hotel performance. RRI represented that "our president receives all of our Tripadvisor Reviews to his email daily." RRI also monitored and kept track of the Red Roof manager's response to guest complaints and would fine the manager if the response was not satisfactory.

53.

RRI also maintained an online reputation management system that monitored and aggregated social media references, online reviews, complaints, news reports, and police reports about its hotels, including the Red Roof, in real time. RRI published TripAdvisor reviews of the Red Roof on its own website. It required Hotel managers to respond to certain reviews, fined managers when RRI found their

resolution unsatisfactory, and contacted Hotel employees about specific negative reviews. At a minimum, these practices put Defendants on inquiry notice of the Red Roof's online reviews.

54.

Defendants had actual or constructive knowledge of the Red Roof's publicly available online reviews that reported prostitution and related crime at the Red Roof from before, during, and after the time J.H. was sold there for sex, including the following reviews.

a. August 2011

> . . . I arrived late after work to find the parking lot full of people walking around in the parking lot and roaming the walkways, bothering anyone who was also around; people obviously messed up on meth or something, or drunk. My partner and I couldn't get to our room without at least ten different people looking in our vehide while we were bringing in our things, following us around, asking for money or **propositioning us**, or commenting on our general appearance. There were, I think, at least **three different women (prostitutes) wandering around and approaching us.** The whole grounds of the property was active and there was **no way the staff couldn't have noticed the activity or the noise**. After I emptied my vehicle, I went in to check with the desk clerk to make sure she knew what was going on. She was nice but **didn't seem bothered by the party in the parking lot**. She said that they didn't have security during the week, just the weekends. She said if something happened they would call the police. The next morning, the same individuals (in the same clothes from the night before) were still milling around, following or commenting or trying to start some kind of altercation. At one point, there were three or four police cars in the parking lot with their sirens on for something that had happened . .

b. <u>January 2012</u>

. . . **numerous men** were going in / out of rooms with women .. seems **illegal activity may have been goirg on**.

c. <u>July 2012 review:</u>

I was surprised, however, at all of the **open drug dealing** going on in the rooms and parking lot. . . . I complained upon checkout. They had a practiced look of surprise on their faces but **I do not believe for a minute that the staff does not know what is going on in this hotel**.

d. <u>July 2012 review:</u>

**Prostitution sting**. **During the stay, there was a prostitution sting. The next night at 2:00 AM, a prostitute knocked on my door wanting to know if I wanted "company."**

e. <u>September 2012</u>

**Staff smokes weed with the guest, mike, shari, sergio, manda. They are too engaged with the pimps and prostitutes there**. Therfe was a bloody pillow under my bed . . .

f. <u>October 2013</u>

. . . Upon entering the parking lot, we checked in and circled to the back of the building, there were **prostitutes getting in and out of cars**. Moments later a police officer patrolled the parking lot causing all of the inappropriate activity to cease from outside and move into rooms. . .

g. <u>May 2016 review:</u>

. . . it was **pretty obvious that the local prostitutes were visiting a room a few doors down. Something I know RRI is pretty familiar with.**

h. August 2016 review:

Within the first hour, my brother and his friend were approached by **prostitutes** who wanted them to come with them.

i. 2016 review:

If **prostitutes and drugs** are what your looking for this is your spot . . . . Passed out vomitus covered people in parking lot 2 days out of three. **Seman splattered on mirror** . . . . Felt so bad for the "working women" with their personal items in garbage bags that I gave away 3 tote bags.

j. November 2016 review:

The hotel was being used by **prostitutes** and **Shady characters were always coming and going.**

k. December 2016 review:

**Drug dealers and pimps** hanging around outside . . . .

l. January 2017 review:

If you enjoy the smell of marijuana coming from 10% of the rooms and **prostitutes** setting up shop next to you then this is the place for you!

m. 2017 review:

. . . A **hooker/drug dealer** was set up 2 doors down and had many visitors during the day/night . . . .

n. 2017 review:

. . . This place is Disgusting there are **hookers** that are staying here and that is not the least of my worries . . . . There is also **lots of drug use** here someone just overdosed. I found crack on the floor . . . .

o. October 2018 review:

People that paid for rooms there looked like **b**.

p. 2019 review:

. . . I saw a **drug bdeal**, it looks like another room had **suspicious women coming in and out and multiple men going in** . . . .

q. 2019 review:

. . . I didn't expect bed bugs and **prostitutes** . . .

r. 2019 review:

. . . THIS PLACE IS KNOWN FOR **DRUGS AND PROSTITUTES** . . .

55.

The Red Roof was one of several hotels in the metro Atlanta area known for its role as a hub for illegal sex trafficking operations, along with other hotels with similar reputations for permitting rampant sex trafficking on their properties.

56.

Defendants also had actual or constructive knowledge of sex trafficking in the area and at hotels owned, operated, controlled, or managed by Defendants, including at the Smyrna Red Roof, which from at least 2009 through 2012 was also a Red Roof Inn corporate location like the Red Roof. The Smyrna Red Roof had rampant and open sex trafficking, including of minor children before and around the that J.H. was sold for sex at the Red Roof. At least one manager of the Smyrna Red Roof also worked as a manager at the Red Roof one day of week as an employee of Defendants, giving Defendants direct knowledge of the rampant sex crimes, including child

sex trafficking, at Atlanta Red Roof locations owned, operated, managed, or controlled by Defendants and ultimately controlled by Defendant RRI.

**III. Defendants' knowledge of sex trafficking generally.**

57.

Defendants knew or should have known of the existence of sex trafficking and its illegality more than 20 years ago, since the passage of the Victims of Trafficking and Violence Protection Act of 2000 and the United Nations' adoption of the Palermo Protocol to prevent, suppress, and punish trafficking in persons.

58.

Defendants knew or should have known that during the relevant period Atlanta was a national hub of sex trafficking and that the crime was prevalent in the city, including at the Red Roof. According to a well-publicized study commissioned by the U.S. Department of Justice, Atlanta has one of the largest illegal sex trafficking economies in the country. In 2007, Atlanta's sex trafficking economy was worth $290 million annually, and traffickers reported average weekly earnings of roughly $33,000.[3] Over the last two decades, sex trafficking has generated billions of dollars

---

[3] *See* Christian Boone, *Study: Atlanta's Sex Trade Highly Profitable,* Atlanta Journal-Constitution, Mar. 13, 2014, https://www.ajc.com/news/crime--law/study-atlanta-sex-trade-highly-profitable/GiuU5vZdoUo5vdUYSaOBNM/ (last visited Nov. 24, 2026); *see also* Meredith Dank et al., *Estimating the Size and Structure of the Underground Commercial Sex Economy in Eight Major US Cities* 30-32 (2014), https://www.urban.org/research/publication/estimating-size-and-structure-underground-commercial-sex-economy-eight-major-us-cities (last visited Nov. 24, 2026).

in illicit profits in metro Atlanta alone. Defendants benefited from some of those illicit profits through the rental rates paid for the Red Roof rooms used to traffic Plaintiff.

59.

Defendants knew or should have known of the Atlanta area's well-publicized reputation as an "epicenter for human trafficking, [] particularly child sex trafficking,"[4] and as "the number one city for child sex trafficking."[5]

60.

Defendants knew or should have known that hotels and motels are "a particularly attractive site for criminal activity ranging from drug dealing and prostitution to human trafficking. Offering privacy and anonymity on the cheap, they have been employed as . . . rendezvous sites where child sex workers meet their clients on threat of violence from their procurers." *City of Los Angeles v. Patel*, 576 U.S. 409, 428–29 (2015) (Scalia, J., dissenting, joined by Roberts, C.J., and Thomas, J.).

---

[4] Sally Yates, *Remarks at Justice Department Event Marking National Slavery and Human Trafficking Prevention Month* (Jan. 29, 2015), https://www.justice.gov/archives/opa/speech/acting-deputy-attorney-general-sally-quillian-yates-delivers-remarks-justice-department (last visited Nov. 24, 2026).

[5] *Id.*

61.

Defendants knew or should have known the following: The National Human Trafficking Hotline has reported that over 91 percent of the calls it received and obtained information on involving hotels and motels were sex trafficking cases, and another 2.6 percent reported a combination of sex and labor trafficking.[6] A 2012 study found that 63 percent of trafficking incidents occurred in hotels.[7] And the Polaris Project found that "75 percent of [trafficking] survivors . . . reported coming into contact with hotels at some point" during their exploitation.[8] Unfortunately, "94 percent" also "disclosed they never received any assistance, concern, or identification from hotel staff."[9]

---

[6] National Human Trafficking Hotline, *National Hotline Cases Occurring in Hotels and Hotels: United States 1/1/2012–12/31/2016*, at 3, https://traffickinginstute.org/wp-content/uploads/2024/06/2023-2023-Federal-Human-Trafficking-Report-WEB-Spreads-LR.pdf (last visited Nov. 24, 2026).

[7] Jon Conte et al., *Business Ending Slavery and Trafficking, Inhospitable to Human Trafficking Program Evaluation* 5 (July 2014).

[8] Polaris Project, *On-Ramps, Intersections, and Exit Routes: A Roadmap for Systems and Industries to Prevent and Disrupt Human Trafficking* 16 (2018), https://polarisproject.org/wp-content/uploads/2018/08/A-Roadmap-for-Systems-and-Industries-to-Prevent-and-Disrupt-Human-Trafficking-Hotels-and-Hotels.pdf (last visited Nov. 24, 2026).

[9] *Id.* at 23.

62.

Defendants knew or should have known that attorneys for the hotel industry estimated and reported to hotel industry representatives that eight out of ten human trafficking arrests occur in and around hotels,[10] and that the industry had been warned, among other things, to "Make sure Hotel not complicit," "Manager not looking the other way," and "No pay off for silence or lack of curiosity."[11]

63.

Defendants knew or should have known that the organization called End Child Prostitution and Trafficking (ECPAT-USA) launched The Code of Conduct for the Protection of Children from Sexual Exploitation in Travel and Tourism (the "Code") in the United States in 2004.[12]

64.

Defendants knew or should have known that the Code, which lays out well-established best practices for the hospitality industry to identify, address, and deter sex trafficking, identifies six reasonable and logical steps hotels and motels can take:

---

[10] Rich Keating, *Human Trafficking: What Is it and How It Impacts the Hospitality Industry* 6 (presentation at AHIA Sprint Conference 2013), https://web.archive.org/web/20191030203754/http://www.ahiattorneys.org/aws/AHIA/asset_manager/getfile/92983.

[11] *Id.* at 19.

[12] *See The Code*, ECPAT-USA, www.ecpatusa.org/code/ (last visited Nov. 24, 2026).

a. establish corporate policy and procedures against sexual exploitation of children;

b. train employees in children's rights, the prevention of sexual exploitation and how to report suspected cases;

c. include a clause in further partner contracts stating a common repudiation and zero tolerance policy of sexual exploitation of children;

d. provide information to travelers on children's rights, the prevention of sexual exploitation of children and how to report suspected cases;

e. support, collaborate, and engage stakeholders in the prevention of sexual exploitation of children; and

f. report annually on the company's implementation of Code-related activities.

65.

Defendants knew or should have known that ECPAT is only one of several high-profile organizations that have for years given hotels and motels the tools to address the scourge of sex trafficking.

66.

Defendants knew or should have known that during the relevant period the Department of Homeland Security ("DHS") published guidelines to help hotels and motels detect and respond to human trafficking. DHS's guidelines instruct

housekeeping, maintenance, front desk, and security, among other hospitality personnel, to be vigilant in looking for signs of human trafficking at hotels and motels, such as:

a. persons who show signs of malnourishment, poor hygiene, fatigue, sleep deprivation, untreated illness, injuries, or unusual behavior;
b. persons who lack freedom of movement or are constantly monitored;
c. persons who have no control over or possession of money or ID;
d. persons who dress inappropriately for their age or have lower quality clothing compared to others in their party;
e. requests for room or housekeeping services (additional towels, new linens, etc.), but denial of hotel staff entry into the room;
f. the presence of multiple computers, cell phones, pagers, credit card swipers, or other technology in the room;
g. extended stay with few or no personal possessions in the room;
h. excessive amounts of sex paraphernalia in rooms (condoms, lubricant, lotion, etc.);
i. the same person reserves multiple rooms;
j. a room is rented hourly, less than a day, or for an atypical extended stay;

k. attempts to sell items to or beg from patrons or staff;

l. cars in the parking lot regularly parked backward, so the license plates are not visible;

m. loitering and solicitation of male patrons;

n. waiting at a table or bar and picked up by a male (trafficker or customer);

o. persons asking staff or patrons for food or money; and

p. persons taking cash or receipts left on tables.

67.

Without a market—a conveniently located and anonymous place to confine humans, exchange money, and peddle sex—sex trafficking would cease to exist. In Plaintiff's case, the Red Roof, for a fee, provided this market for Plaintiff to be confined and sold.

## IV. Defendants' failure to respond to trafficking at the Red Roof.

68.

Defendants could have acted on what they knew. They did not take sufficient action in response to the sex trafficking they knew was happening at the Red Roof.

69.

Defendants could have terminated the Red Roof as a Red Roof location or otherwise curtailed its operations until it was able to adequately respond to the

rampant and illegal activity, including child sex trafficking. RRI has taken such steps at other hotels where sex trafficking is alleged to have occurred. Termination severely disrupts a hotel's operations and, with them, the commercial sex and trafficking operations run there. At a minimum, it would have stopped Defendants from profiting from J.H.'s trafficking.

70.

In September 2015, for example, RRI terminated its franchise agreement with a hotel in Charlotte, North Carolina. The hotel had come under media scrutiny after a prostitution sting uncovered child sex trafficking there during the 2012 Democratic National Convention.

71.

Defendants did not do the same at the Red Roof. Instead, they prioritized hotel revenue and profits over guest safety. Commercial sex trafficking, including J.H.'s, continued at the Red Roof—owned, operated, and controlled by RRI, and the entities it owned and controlled—even though Defendants had every reason to know about it. The Red Roof focused on putting "heads in beds" and making money, rather than protecting the victims that were sold for sex to pay for the room rentals at the Red Roof.

## COUNT I
## STATUTORY LIABILITY: SEX TRAFFICKING
## 18 U.S.C. § 1595

72.

Plaintiff incorporates the foregoing and all following allegations as if fully restated herein.

73.

In violation of the Trafficking Victims Protection Reauthorization Act ("TVPRA"), 18 U.S.C. § 1595(a), Defendants knowingly benefitted from participation in a venture that Defendants knew or should have known engaged in acts in violation of the TVPRA.

74.

Defendants knowingly benefitted by receiving revenue generated by the operation of the Red Roof, including the revenue generated for the room in which Plaintiff was trafficked. Each day Plaintiff was trafficked at the Red Roof, Defendants knowingly benefitted by receiving money from Plaintiff's trafficking in the form of room-rental fees, royalties, and other concessions. Defendants, RRI III, RRI West, and RRI each received a financial benefit, whether revenue or royalty, from every room rental at the Red Roof.

75.

Defendants' operation of the Red Roof constituted a venture.

76.

Defendants participated in a hotel venture and knew or should have known that the operation of the Red Roof violated the TVPRA by harboring and falsely imprisoning Plaintiff so that Plaintiff could be sold for sex as a minor at the Red Roof. Defendants knew or should have known Plaintiff was illegally being sold for sex at the Red Roof.

77.

Defendants also participated in a venture involving Plaintiff's sex trafficker. The rental of rooms for profit to Plaintiff's sex trafficker, rooms in which Plaintiff and others were illegally sold for sex, also constituted a venture under the TVPRA.

78.

Defendants' harboring Plaintiff at the Red Roof as part of her sex trafficking constituted false imprisonment. At times, Plaintiff's false imprisonment at the Red Roof was independent of any other aspect of her trafficking, such as sexual encounters, assaults, or batteries she may have endured.

79.

Defendants' conduct, and each and all ventures in which Defendants participated, utilized the channels and instrumentalities of, or otherwise affected, interstate or foreign commerce, among others including highways and interstates, vehicles traveling and sold in, goods and services, advertisement, and the internet.

80.

Defendants knew or should have known the venture in which they participated had engaged in one or more acts in violation of the TVPRA because Defendants' agents, employees, and representatives participated in Plaintiff's child sex trafficking at the Red Roof. Defendants knew or should have known of this participation.

81.

Defendants also knew or should have known the venture in which they participated had engaged in acts in violation of the TVPRA because Defendants' agents, employees, and representatives knew or should have known of other sex trafficking and illegal criminal activity occurring at the Red Roof.

82.

Each Defendant is directly liable under 18 U.S.C. § 1595(a) for its own conduct and vicariously liable for the actions and knowledge of its agents, employes, subordinates, representatives, and others acting on their behalf or in their interests, including the other Defendants. In particular, RRI is also liable for the actions and knowledge of RRI III and RRI West, which it ultimately owned and controlled and which, with them, functioned as a single entity.

83.

Plaintiff has suffered substantial physical, emotional, and psychological harm and other damages as a direct and proximate result of Defendants' knowing benefit from participation in the ventures as alleged herein.

84.

Defendants are liable to Plaintiff for her damages in an amount to be proven at trial, including reasonable attorneys' fees and punitive damages under 18 U.S.C. § 1595.

85.

Thus, as described herein, Defendants are each and all jointly and severally liable to Plaintiff for damages arising from the indivisible injuries to Plaintiff, whose damages were proximately caused by the acts discussed in this count.

## COUNT II
## NUISANCE

86.

Plaintiff incorporates the foregoing and all following allegations as if fully restated herein.

87.

O.C.G.A. § 41-1-1 provides that "A nuisance is anything that causes hurt, inconvenience, or damage to another and the fact the act done may otherwise be lawful shall not keep it from being a nuisance. The inconvenience complained of shall not

be fanciful, or such as would affect only one of fastidious taste, but it shall be such as would affect an ordinary, reasonable man."

88.

O.C.G.A. § 41-1-2 provides that "Nuisances are either public or private. A public nuisance is one which damages all persons who come within the sphere of its operation, though it may vary in its effects on individuals. A private nuisance is one limited in its injurious effects to one or a few individuals."

89.

O.C.G.A. § 41-1-3 provides that "A public nuisance generally gives no right of action to any individual. However, if a public nuisance in which the public does not participate causes special damage to an individual, such special damage shall give a right of action."

90.

O.C.G.A. § 41-3-1 provides that "Whosoever shall knowingly erect, establish, maintain, use, own, or lease any building, structure, or place for the purposes of sexually related charges shall be guilty of maintaining a nuisance; and the building, structure, or place, and the ground itself in or upon which such sexually related charges occurred or were conducted, permitted, carried on, continued, or shall exist, and the furniture, fixtures, and other contents of such building or structure shall be deemed to be a nuisance."

**Public Nuisance**

91.

The Red Roof's history of rampant crime and illegal sex activity created a spillover effect that led to other crime occurring in the surrounding area.

92.

The Red Roof caused or contributed to a blighting effect on the surrounding community, so that the Red Roof negatively damaged all persons who came within the sphere of operation of the crime, sex trafficking, and prostitution at the Red Roof, although the effects on each person may have varied.

93.

The illegal prostitution and sex trafficking nuisance occurring at the Red Roof had an appreciable blighting effect on the surrounding community, permitting persons of questionable character, and encouraged idleness, loitering, vagrancy, and tended to breed crime and debauch the morals of the community. The harmful effects of the nuisance continue to harm the public to this day.

94.

The acts and omissions of Defendants in permitting prostitution and sex trafficking at the Red Roof caused special damages to Plaintiff, as she was the victim of child sex trafficking at Defendants' nuisance Hotel and suffered damages to her

health, including mental and emotional harm, pain and suffering, and each Defendant is liable to Plaintiff for all such damages.

**Public Nuisance *Per Se***

95.

The Red Roof constituted a statutory nuisance *per se* under Georgia law because each Defendant knowingly or negligently turned a blind-eye and permitted illegal sexually related crimes to occur at the Red Roof including sex trafficking.

96.

A business where illegal practices are permitted constitutes a nuisance.

97.

A business, like the Red Roof, that allows prostitution and sex trafficking is a *per se* public nuisance under Georgia law. *Brindle v. Copeland*, 145 Ga. 398, 89 S.E. 332 (1916) ("A lewd house is per se a 'public nuisance.'").

98.

Plaintiff was directly harmed as a result of the sex crime nuisance at the Red Roof that permitted illegal sexual activity to occur there.

99.

Defendants are liable for nuisance (public nuisance and/or *per se* public nuisance) by reason of their failure to remedy the dangerous condition of prostitution and sex trafficking that persisted over a period of time as a continuous and repetitious

condition and of which Defendants had express notice and knowledge, and whereby Plaintiff was a direct victim of such activity.

## COUNT III
## STATUTORY LIABILITY: MASHA'S LAW, 18 U.S.C. § 2255

100.

Plaintiff incorporates the foregoing and all following allegations as if fully restated herein.

101.

Plaintiff was under the age of 18 when she was trafficked at the Red Roof on one or more occasions.

102.

Plaintiff was a victim of one or more violations of 18 U.S.C. § 1591 at the Red Roof.

103.

As described above, Defendants directly participated in the child sex trafficking of Plaintiff by knowingly assisting and facilitating Plaintiff's sex trafficking at the Red Roof because Defendants' employees openly participated in Plaintiff's trafficking, *supra* ¶¶ 18–55. Thus, Defendants committed the predicate offense of a violation of 18 U.S.C. § 1591 as to Plaintiff.

104.

Plaintiff suffered personal injury as a result of Defendants' violations of 18

U.S.C. § 1591 and 18 U.S.C. § 2255.

105.

Thus, as described herein, Defendants are jointly and severally liable to Plaintiff for compensatory and punitive damages, in an amount to be determined at trial.

**DAMAGES**

106.

Plaintiff incorporates the foregoing and all following allegations as if fully restated herein.

107.

As a proximate and foreseeable result of Defendants' violations of the TVPRA and Georgia law, Plaintiff sustained personal injuries, mental and emotional pain and suffering, experienced mental anguish, and suffered other damages as will be proven at trial. Plaintiff brings each and every claim permissible under Georgia and federal law against Defendants for injuries suffered in the incident at issue, and to recover for all special damages, economic losses, medical expenses, necessary expenses, pain and suffering, and all compensatory, special, actual, general and punitive damages permissible under Georgia and federal law. Plaintiff seeks all compensatory, special, economic, consequential, general, punitive, and all other damages permissible under Georgia and federal law, including, but not limited to:

a. Personal injuries;

b. Past, present and future conscious pain and suffering;

c. Loss of enjoyment of life;

d. Mental anguish and emotional distress;

e. Incidental expenses;

f. All special, compensatory, economic, punitive, and other damages permissible under Georgia and federal law; and

g. Consequential damages to be proven at trial.

108.

Plaintiff is entitled to an award of punitive damages without limitation or cap because the actions of Defendants and their employees were willful and wanton and showed an entire want of care, which raises the presumption of a conscious indifference to consequences.

109.

Defendants' actions evidence a species of bad faith, were and are stubbornly litigious, and have caused Plaintiff undue expense. Thus, Plaintiff is entitled to recover her necessary expenses of litigation, including an award of reasonable attorneys' fees and expenses required by this action. (O.C.G.A. §§ 13-6-11, 9-11-68 and 9-15-14, and 18 U.S.C. § 1595(a)). Furthermore, Plaintiff is entitled to all expenses of litigation and attorneys' fees pursuant to all other Georgia and federal statutory and common laws.

***

**WHEREFORE**, Plaintiff prays for a judgment to be awarded to her and against Defendants for the following:

a. Process issue as provided by law;

b. Plaintiff be awarded actual damages in amounts to be shown at trial from Defendants jointly and severally or as otherwise allowed by law;

c. Plaintiff be awarded all general, special, compensatory, economic, consequential, punitive and other allowable damages in accordance with the enlightened conscience of an impartial jury from Defendants jointly and severally or as otherwise allowed by law;

d. Plaintiff be awarded a trial by jury; and

e. Plaintiff have such other relief as this Court deems just and appropriate under the circumstances.

**TRIAL BY JURY IS HEREBY DEMANDED**.

[*Signature on following page*.]

Respectfully submitted on November 25, 2026.

**ANDERSEN, TATE & CARR, P.C.**

*/s/ Stephen Morrison*
STEPHEN D. MORRISON, III
Georgia Bar No. 700828
smorrison@atclawfirm.com
PATRICK J. MCDONOUGH
Georgia Bar No. 489855
pmcdonough@atclawfirm.com
JONATHAN S. TONGE
Georgia Bar No. 303999
jtonge@atclawfirm.com

One Sugarloaf Centre
1960 Satellite Boulevard, Suite 4000
Duluth, Georgia 30097
(770) 822-0900 | Telephone
(770) 822-9680 | Facsimile

## CERTIFICATE OF COMPLIANCE

Under Local Rules 5.1(C) and 7.1(D), I hereby certify that the foregoing filing complies with the applicable font type and size requirements and is formatted in Times New Roman, 14-point font.

**ANDERSEN, TATE & CARR, P.C.**

*/s/ Stephen Morrison*
STEPHEN D. MORRISON, III
Georgia Bar No. 700828
smorrison@atclawfirm.com
PATRICK J. MCDONOUGH
Georgia Bar No. 489855
pmcdonough@atclawfirm.com
JONATHAN S. TONGE
Georgia Bar No. 303999
jtonge@atclawfirm.com

One Sugarloaf Centre
1960 Satellite Boulevard, Suite 4000
Duluth, Georgia 30097
(770) 822-0900 | Telephone
(770) 822-9680 | Facsimile